INDIANA HARBOR BELT RAILROAD
COMPANY,
Plaintiff–Counterdefendant,

v.

PIELET BROTHERS SCRAP IRON &
METAL, INC.,
Defendant–Counterplaintiff.

PIELET BROTHERS SCRAP IRON &
METAL, INC., Third Party Plaintiff,

v.

GENERAL MOTORS CORPORATION,
Third Party Defendant.

No. 85 C 9741.

United States District Court,
N.D. Illinois, E.D.

Dec. 30, 1987.

Anna M. Kelly, Indiana Harbor Belt R. Co., Chicago, Ill., for plaintiff-counterdefendant.

Margaret Muller Wilson, Steven C. Weiss & Associates, Chicago, Ill., for defendant-counterplaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Indiana Harbor Belt Railroad Co. ("Railroad") has sued Pielet Brothers Scrap Iron & Metal, Inc. ("Pielet") for certain storage and switching charges. Pielet has denied liability and counterclaimed for breach of contract and unjust enrichment.[1]

Each party has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on Railroad's claims, and Railroad has moved for summary judgment on Pielet's Counterclaim. For the reasons stated in this memorandum opinion and order:

1. Pielet's motion is granted as to Count I (storage charges).

2. Railroad's motion is granted in part and denied in part as to Count II (switching charges).

3. Railroad's motion is denied as to Pielet's Counterclaim.

### Facts [2]

Railroad is an interstate carrier serving Pielet's plants at Argo and McCook, Illinois. Pielet is a scrap dealer that purchases and demolishes locomotives traded in by

---

1. Pielet has also brought a third-party complaint against General Motors Corporation Electro–Motive Division ("EMD"). That claim is not dealt with in the current motions.

2. Rule 56 principles impose on each party seeking summary judgment the burden of establishing the lack of a genuine issue of fact (*Celotex Corp. v. Catrett,* 106 S.Ct. 2548, 2553 (1986)). Here the parties have entered into a Stipulation of Facts ("Stip.—"), which has been supplemented by some added exhibits (cited "D.Ex.—") submitted by Pielet with its response to Railroad's motion as to Pielet's Counterclaim. As for the Stipulation, the parties agree it leaves almost no disputed factual issues on the direct claim. One area of factual dispute did remain—a series of relatively minor discrepancies between the records of Railroad and Pielet as to the dates certain locomotives arrived. That would have become relevant only if this Court had concluded Pielet was liable for storage charges as a matter of law. To avoid a no-decision result, the parties had agreed to allow this Court to resolve those disputes on this motion should it find Pielet liable on the direct claims. That agreement has been mooted by this opinion's rejection of Pielet's liability for storage charges.

various railroads on their purchase of new locomotives from EMD or General Electric Company (Stip. 1).

Between January 1, 1984 and March 25, 1985 Railroad received 397 locomotives for delivery to Pielet (Stip. 2, 3). Because Pielet could not accommodate all the locomotives it was receiving, it leased 4,000 feet of track from Railroad to store incoming locomotives. That was initially for a 60–day period beginning January 11, 1984 at a cost of $1,644 (D.Ex. I). It was renewed periodically, although on May 10, 1984 the rent was increased to $10,000 for 60 days (D.Ex. II). Pielet leased an additional 4,000 feet of track effective April 15, 1984 for $10,000 for 60 days (D.Ex. III), and that lease was also periodically extended. On March 22, 1985 Pielet cancelled the leases (as it had a right to do) effective April 8 and 10 (Stip. 2).

As each locomotive or group of locomotives arrived, Railroad both telephoned Pielet's general manager and issued a written arrival notice to Pielet. Railroad issued no "constructive placement notice" for any locomotive (*id.*).[3] Its telephone notices did not inform Pielet whether the locomotives were placed on leased track (Beans Aff. ¶ 6). Because of the high volume of incoming locomotives, Pielet's leased track was unable to accommodate all of them, and some were left on Railroad's tracks for extended periods of time (Stip. 3). Railroad sometimes did not move a locomotive from its track to Pielet's even though space was available because of the equipment's condition or for operational reasons (*id.*). As Stip. 3 says:

Due to the condition of some of these locomotives the railroad was reluctant to move them around too frequently lest they derail or fall apart. Therefore, although a locomotive might be ready to be moved onto the leased track from an unleased track when a locomotive already on the leased track was removed, the railroad did not physically move it but left it at its initial location in the Blue Island Yard.

When Pielet was able to handle additional locomotives at its scrap facilities it notified Railroad by telephone (*id.* at 5). Those notices occasionally specified a particular locomotive to be delivered to Pielet, but usually simply indicated how many it was ready to dismantle (*id.* at 4). Railroad would then deliver that number of locomotives to Pielet.

In October 1985, six months after Pielet cancelled its leases for Railroad's track, Railroad notified Pielet it intended to hold Pielet liable for storage and switching charges arising from the series of transactions. While the parties disagree as to whether such charges apply, they agree on the rates that would apply under the applicable tariffs (*id.* at 5):

1. For storing locomotives not held on leased track, the tariff was $30 per day, starting 48 hours after the first 7:00 a.m. after notice was sent or given.

2. For moving locomotives from the leased track to Pielet's facilities, the switching charge was $358 per locomotive until July 1, 1984, when it increased to $359.

---

3. Stip.Ex. A is a sample Arrival Notice. It identifies the shipment by initial, car number, weight, shipper and the like. That same form is used both for arrival notices and for "constructive placement notices," with Railroad indicating which notice is intended by filling in the appropriate blank:

Agent will check paragraphs 1 or 2 as the case may be to indicate to Consignee or Consignor the status of cars for him.

___1. ARRIVAL NOTICE—You are hereby notified that the following cars consigned to or ordered to or by you have arrived and will be held for (loading) (unloading) reconsigning or reshipment on (your private tracks) (public delivery tracks). These cars are sub-

ject to the Demurrage Rules published in the tariff lawfully on file, and charges in accordance therewith will be made for detention beyond free time therein provided.

___2. CONSTRUCTIVE PLACEMENT NOTICE—You are hereby notified that the following cars consigned to or ordered to or by you have arrived and cannot be delivered account [sic] of your act, neglect, or inability to receive, and tender of same is hereby made. These cars are subject to the Demurrage Rules published in the tariff lawfully on file, and charges in accordance therewith will be made for detention beyond free time therein provided.

Railroad claims Pielet owes it $127,080 for storage charges and $115,504 for switching charges.[4] Because it did not always move locomotives onto leased track when space became available, Railroad calculated the charges based on the fiction that it had done so. Thus Railroad billed storage charges only for locomotives that would not have fit on Pielet's leased track, obviously minimizing the storage charges. On the other hand, Railroad treated (for billing purposes) most orders for locomotives as orders for those on leased track rather than for those "in storage." Because switching charges apply only (if at all) to cars switched from leased track, that accounting method maximized switching charges[5] (Stip. 4–5 and Exs. B and C).

### Storage Charges

■ Pielet contends that because Railroad did not give Pielet constructive placement notices when locomotives were placed in storage, it is not liable for the storage charges. Railroad says the governing tariff does not require it to issue constructive placement notices: Arrival notices are enough.

Both sides agree the applicable tariff is Part 2 of Tariff PHJ 6004–N (Stip Ex. D). Section 2000 of that Part applies to "cars or other units of equipment moving on own wheels as freight at tariff rates." Item 2005 reads in full (emphasis added):

> After the expiration of forty-eight (48) hours free time computed from the first 7:00 AM after notice has been sent or given, inclusive of Saturdays, Sundays and holidays, railroad and privately-owned cars and other railroad and privately-owned equipment, moving on own wheels as freight at tariff rates, will be subject to a charge of $30.00 per car or other unit of equipment per day, inclusive of Saturdays, Sundays and holidays, while held on tracks of this railroad.

> When cars or other equipment described above cannot be delivered on account of

the inability of the consignee, such cars or other equipment will be held at destination, or if it cannot reasonably be accomodated [sic] there, at an available hold point *and notice sent or given the consignee that the cars or other equipment are so held* and time will be computed from the first 7:00 AM thereafter. Under this section, the time of movement between hold point and destination and any other time for which the railroad is reponsible [sic] will not be computed against the cars or other equipment.

Item 2005 uses neither the term "constructive placement notice" nor "arrival notice." Railroad seeks to draw from the absence of the former term the inference that the latter type of notice is sufficient (an argument Pielet could well turn around against Railroad by pointing to the absence of the latter term). But that argument is really oversimplistic either way, for it substitutes labels for legal analysis. Item 2005 *does* require a notice from Railroad that the locomotives "are so held" whenever Railroad is unable to place them on Pielet's track ("inability of the consignee" to take delivery on its own facility, in this instance its leased track). Neither the written Arrival Notices Railroad sent Pielet nor the phone calls it made to Pielet's general manager notified Pielet the locomotives "are so held" on Railroad's track (see n. 3). It is therefore unnecessary to determine whether Constructive Placement Notices were required (although they certainly would have sufficed), because the notice that *was* sent did not comply with the tariff.

Under Item 2005 it is the notice that starts the storage charge clock ticking. Because no adequate notice was provided, no storage charges accrued (*Kansas & Missouri Railway and Terminal Co. v. Beal, Inc.*, 338 F.Supp. 1362, 1367, 1369 (D.Kan.1972); *Illinois Central Railroad Co. v. Ready–Mix Concrete, Inc.*, 323

---

**4.** Railroad also seeks prejudgment interest, a claim not dealt with in this opinion.

**5.** Railroad then "transferred" cars from storage to leased track, so this fiction had no effect on its calculation of storage charges.

F.Supp. 609, 611 (E.D.La.1971)).[6] There is no material issue of triable fact, and Pielet is entitled to judgment on the claim for storage charges as a matter of law.[7]

### Switching Charges

■ Pielet says it is not liable for the switching charges because Railroad breached its duty to route the locomotives over the cheapest available route. Railroad responds it had no duty to make up Pielet's switching lists. If Pielet wanted it to deliver locomotives off storage before those from the leased track, Railroad says Pielet should have told it so.

Both parties' memoranda treat the issue as involving the physical movement of cars between storage and the leased track. Yet the Stipulation of Facts, as well as its Exs. B and C, seem to indicate the real issue is after-the-fact bookkeeping. This opinion proceeds on the latter premise.[8]

When Pielet ordered locomotives into its facilities Railroad usually chose which ones to deliver, presumably based on its convenience. There is no indication in the record that Railroad considered whether the locomotive was then physically on the leased track. Yet Stip.Ex. C, prepared well after the leases were terminated, assumes deliveries to Pielet almost invariably[9] came off the leased track, which was then replenished with locomotives from storage. Indeed Stip. 4 describes the Exhibit as showing movement "from storage to leased track to plant."[10]

Some method of accounting for the switching charges was necessitated by the fact that Railroad did not actually fill the leased track and then continuously shift cars physically from its track to Pielet's. There is nothing wrong with Railroad leaving locomotives where they are rather than constantly shuttling them about. It seems the efficient thing to do, and Stip. 3 (quoted earlier) states good reasons for doing so. What remains is the issue of how Pielet should be charged for the switching services Railroad *did* provide.

Railroad says, and Pielet does not deny, that Railroad's tariffs mandate that Pielet be charged for locomotives switched from the leased track. Railroad does not say, however, that its tariffs mandate the specific accounting method it has chosen.[11]

6. Both *Kansas & Missouri* and *Illinois Central* rejected demurrage charges (not storage charges) when constructive placement notices had not been given to the consignee. They are thus not precisely on point. Yet the underlying principle of requiring strict compliance with tariffs by railroads, as well as the strong similarity between the two situations, compels the conclusion that Railroad's failure to give proper notice precludes its recovery. Railroad does not quarrel with the proposition that if its notice was indeed defective, no storage charges may be levied.

7. Pielet advanced, as a second argument for summary judgment, the notion that placing the locomotives in storage was not its fault because it could have accommodated the locomotives at its facilities. Although the factual record to support that contention is inadequate to allow summary judgment, the contention itself underscores the wisdom of Item 2005 in requiring notice that the locomotives were being held in a status that would lead to storage charges. With such notice, Pielet might have restructured its operations to reduce or even eliminate the need for storage. Railroad correctly notes Pielet chose not to use all of the storage space available at its own facilities because that would have caused operational difficulties. But Pielet might very well have lived with those difficulties to save $127,000.

8. Perhaps this Court is misreading the record on this score. If Stip.Ex. C actually reflects the physical movement of locomotives, the parties should bring that fact to this Court's attention. No opinion is expressed on the appropriate outcome in that event.

9. This Court's count shows just 20 locomotives released to Pielet directly from storage.

10. Railroad offers one explanation for that: the illogic of leaving locomotives first placed on the leased track there for long periods of time, while delivering newer arrivals directly from storage. Yet Stip.Ex. C does not appear to describe actual locomotive movements. In any event, the accounting in Stip.Ex. C is nowhere near a FIFO procedure. Many locomotives originally placed on the leased track in January were not delivered until September. Meanwhile others had come and gone, but Railroad's accounting still put them into the "leased track" category for at least a few days (thus qualifying for the switching fee).

11. If the tariff does in fact require that accounting method, the parties should so inform this Court.

What the parties have stipulated is that there was no written agreement between them as to the switching of locomotives.

While it is not clear exactly how the correct switching charges should be calculated, one thing is clear: Any post-hoc accounting method that appears artificially to maximize Pielet's liability for such charges violates fundamental fairness.[12] After all, it was Railroad that usually chose the locomotives for delivery to fit its own needs or convenience. What is needed is an effort by the parties to develop an accounting approach that more reasonably reflects the number of locomotives that would actually have been switched from leased track to Pielet's facilities under routine operating procedures.

This Court is not at all suggesting Pielet is correct in urging a LIFO accounting (although that may turn out to be the only alternative, given the records now available). There is no indication such a method of operation would have been reasonable in the circumstances. Rather Pielet is entitled to a method of accounting to which the parties would have been willing to agree at the outset, had both parties been aware that switching charges would apply.[13]

Accordingly Railroad is entitled to a judgment only as to the existence of Pielet's liability for switching charges, but not as to the amount of that liability. At this point the most sensible approach for the parties is to seek agreement on a reasonable method of reconstructing what switching charges would have been under appropriate operating procedures. If they cannot reach such agreement, further submissions for decision by this Court (or trial) will be necessary.

*Counterclaim*

Pielet's counterclaim seeks damages based on alleged oral representations by Railroad that the increase in periodic rent from $1,644 to $10,000 would enable it to "take all steps necessary to exclude the subject shipments from liability for switching charges." While it was not clear from the pleading itself, Pielet now says it seeks only the difference between the original rent and the increased amount.

■ Two preliminary issues can be dealt with quickly. First, while Railroad is certainly correct that an agreement not to impose actual shipping charges would be unenforceable because it would exempt a shipper from a tariff, that truth does not automatically absolve Railroad from liability for a misrepresentation. As the earlier discussion has held, Pielet would be liable for switching charges even if there were such an exculpatory agreement. But that does not necessarily mean Pielet must also pay the higher rent it allegedly agreed to precisely to avoid (or minimize) those very charges. Second, the fact that Pielet has recovered part of the rent from EMD (and seeks the rest in its third-party claim) is simply not relevant. Should Pielet recover on the Counterclaim, its rights against EMD (and vice versa) may be affected, but Pielet's success in sharing its costs with EMD thus far does not affect its rights against Railroad.

■ Railroad says summary judgment is appropriate because (1) the lease is an unambiguous written expression of the parties' entire agreement and (2) the parol evidence rule therefore bars admission of extrinsic evidence to supplement or contradict that agreement. It is worth noting (though it is certainly not dispositive) that

---

**12.** This should not be misconstrued as accusing Railroad of bad faith or of trying to "stick it to" Pielet. It appears from Stip.Ex. B that maximizing switching charges is a side effect of the method chosen to account for storage charges. That latter method, it will be recalled, properly sought to minimize storage charges to Pielet—an indication of Railroad's effort to be reasonably evenhanded.

**13.** Once again it is Railroad's failure to bill promptly for switching charges that has caused

the difficulty. Had it billed Pielet on a current basis, rather than 21 months after the first lease began, Railroad and Pielet might well have worked out a reasonable operating and billing procedure early on. However, these charges are not like the storage charges due under Tariff Item 2005: These accrue even without notice to the consignee. Thus Railroad's failure to provide timely notice on billings does not negate the entire liability.

the leases do not contain integration clauses. But more importantly, in this instance extrinsic evidence must be reviewed to determine whether the agreement as reflected in the lease is ambiguous or unambiguous (in the sense that it excludes the claimed representation).

Railroad claims there is no ambiguity because Paragraph Thirteenth of the lease says in part (after confirming Railroad's right to move its own cars and engines over the sidetrack for its own operations):

> Lessee's use of said sidetrack shall be subject to the rules and regulations prescribed in Railroad Company's filed tariffs.

But that clause does not negate or preempt an agreement on Railroad's part to conduct itself so as to minimize the applicability of those tariffs.[14] Admittedly the primary purpose of the lease was to allow Pielet to avoid storage charges that would otherwise accrue under the tariff, and Railroad agrees the tariff allowed that. It is not inherently unreasonable for Pielet to have believed the lease would have freed it from (or minimized) switching charges as well, particularly if Railroad said it would. In that context Paragraph Thirteenth must be viewed as ambiguous.

Both because the contract is ambiguous in that sense and—independently—because extrinsic evidence is always admissible to show fraud or mutual mistake, such extrinsic evidence may be considered here. Pielet points not only to Railroad's representations (a controverted matter) but to the course of dealing between the parties. After the rent was increased Railroad sent no bills for switching charges, at least suggesting Railroad itself may have believed

the lease precluded such charges. Whether Pielet's Counterclaim is based on a theory of mutual mistake, fraud in the inducement, failure of consideration or unjust enrichment,[15] Pielet has advanced enough evidence (with the appropriate reasonable inferences in its favor) to make out a case. Summary judgment for Railroad is not appropriate.

### Conclusion

There are no genuine issues of material fact as to Complaint Count I, and Pielet is entitled to a judgment as a matter of law on that claim. Count I is dismissed.

There are also no genuine issues of material fact as to the issue of Pielet's liability on the claim in Complaint Count II, though disputed factual issues preclude judgment in Railroad's favor for a specific amount. Pielet is held liable for switching charges as a matter of law, and the parties are urged to seek agreement on a method of accounting for damages consistent with this opinion.

Finally, disputed outcome-determinative facts exist as to Pielet's Counterclaim. Railroad's motion for summary judgment on the Counterclaim is therefore denied.

This action is set for a status hearing January 11, 1988 at 9:00 a.m. At that time the parties are directed to report on the anticipated steps (and timetable) for resolving all still-open issues.

---

**14.** In fact Paragraph Thirteenth introduces its own ambiguity, in that sense, when it speaks of *"Lessee's* [Pielet's] use of said sidetrack." It must be remembered that Railroad and *not* Pielet actually controlled that use: Railroad determined how the movement of locomotives would take place, and in that way it was in a position to control the imposition of charges on Pielet. Even apart from the agreement alleged in the Counterclaim, Railroad could scarcely assert (for example) the language of Paragraph Thirteenth was "unambiguous" in giving Railroad carte blanche to operate so that the admittedly

binding tariff charges would be imposed in every possible instance to Pielet's detriment.

**15.** In the federal system the viability of claims is tested by the facts advanced by the claimant (see—albeit in the pleading context—*Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)), not by the legal label attached to those facts. Thus Pielet's allegations of failure of consideration (Counterclaim ¶ 7) and unjust enrichment (Counterclaim ¶ 8) are not necessarily dispositive (or exhaustive).